Sterling R. Peterson, #020628
Sterling@DentonPeterson.com
Larry A. Dunn, #026231
Larry@DentonPeterson.com



1930 N. Arboleda Road, Suite 200
Mesa, Arizona 85213
Telephone: (480) 325-9900
Facsimile: (480) 325-9901
HTTPS://ARIZONABUSINESSLAWYERAZ.COM
*Attorneys for the Defendants*

# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| SFM, LLC d/b/a Sprouts Farmers Market,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>Best Roast Coffee, LLC, a Wyoming limited liability company; and Jason Roe and Jane Doe Roe, husband and wife,<br><br>　　　　Defendants. | Case No. 2:19-CV-04820-JAT<br><br>**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

Defendants Best Roast Coffee, LLC, ("BRC") and its Chief Executive Officer, Defendant Jason Roe, hereby file their Response to Plaintiff's Motion for Preliminary Injunction ("Plaintiff's Motion").

Plaintiff's Motion should be denied because Defendant cannot establish it is likely to succeed on the merits of its claims.

## 1. PERTINENT BACKGROUND

### A. The Business Relationship

This dispute arises out of the business relationship entered into between Defendant Best Roast Coffee and Plaintiff Sprouts Farmers Market ("SFM") back in 2015. [See Declaration

of Jason Roe, attached hereto as **Exhibit A**; <u>see</u> <u>also</u>, Complaint at ¶¶ 47-48].  In March of 2015 executives from BRC and SFM began discussions related to putting coffee bars in Sprouts retail stores locations using BRC's trade secret processes and products.  [See **Exhibit A**].

In connection with their discussions regarding the placement of coffee bars in SFM locations, and in furtherance of their business relationship, SFM and BRC (and their respective officers and directors) entered into and executed a "Non-Circumvention Agreement" ("the Agreement") in November 2015.  [<u>See</u> Non-Circumvention Agreement attached hereto as **Exhibit B**].

The parties expressly anticipated a business opportunity in signing the Agreement which reads:

- [BRC] has a business investment opportunity which it desires to present to [SFM] and any and all other opportunities directly relating to or derived from such opportunity (the "Opportunity"), and intends to assist [SFM] with respect to the Opportunity

- [SFM] desires to be presented with the Opportunity to acquire the Opportunity and [BRC] desires to present the Opportunity to [SFM] subject to the terms and conditions of this Agreement.

[<u>See</u> **Exhibit B**].

The creation of healthy coffee espresso bars in Sprouts stores utilizing BRC's trade secret processes and products is the Opportunity both parties expressly contemplated when they executed the Agreement.  [<u>See</u> **Exhibit A**; <u>see</u> <u>also</u>, **Exhibit B** at p.6, Exhibit A].  BRC and SFM then proceeded to create over fifty-five coffee espresso bars in Sprouts stores around the country.  [<u>See</u> **Exhibit A**].

**B. Sprouts Corporate Officer Grants BRC Permission to Use SFM's Intellectual Property and Declares the Information Contained in the "Press Release" is True**

Mark Morton was a corporate officer of SFM and he oversaw the espresso bar and coffee program within Sprouts.  [See generally, Declaration of Mark Morton, attached hereto as **Exhibit C**, at pg. 1, ¶ 2; see also, Declaration of Mark Morton, attached hereto as **Exhibit D**].    As a representative of SFM, he signed the Vendor Set Up form on behalf of SFM [Dkt. 13-1, pg. 2].  Morton expressly refutes SFM's primary contention in its Motion for Preliminary Injunction that BRC has "never had authority to use the SPROUTS Marks, the domain name www.sprouts.coffee, or [to] hold themselves out as endorsed or sponsored by Sprouts."  [See Dkt. 9 at pg. 8, ll. 28 – pg. 9, ll. 2].

Morton expressly stated under penalty of perjury that he "gave the directive to [his] admin, Nicole Lambeck, to email [BRC] the Market Corner Coffee logos for the proposed partnership and private branding of the Best Roast Coffee/Sprouts coffee bar program."  [See **Exhibit C**, at pg. 2, ¶ 1; see also, **Exhibit D**, at ¶ 7].  He also testified that Sprouts was fully aware that BRC owned and was using the "sprouts.coffee" web domain.  [See **Exhibit D** at ¶ 8].  Indeed, he declared that SFM sent its purchase orders for new coffee bars to the "sprouts.coffee" URL and used the "ask@sprouts.coffee" address when it had questions for BRC.  [See id.]  SFM knew that the "sprouts.coffee" website was used by BRC as a tool to promote the espresso bars inside the Sprouts stores.  [See id. at ¶ 9].  He further explained that the "sprouts.coffee web site was a tool used to promote the espresso bars inside Sprouts."  [See id. at ¶9].

Morton also testified that he read the "media release" SFM is complaining about and "it is accurate and true."  [See **Exhibit D**, at ¶ 21].

DENTON PETERSON, PC
ATTORNEYS & COUNSELORS AT LAW
1930 N. ARBOLEDA ROAD, SUITE 200
MESA, AZ 85213

## 2. SPROUTS IS NOT LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS

The very crux of SFM's Motion arises from its contention that BRC has "never had authority to use the SPROUTS Marks, the domain name www.sprouts.coffee, or hold themselves out as endorsed or sponsored by Sprouts." [See Dkt. 9 at pg. 8, ll. 28 – pg. 9, ll. 2]. However, one of SFM's own officers signed a declaration testifying under penalty of perjury that he did give SFC permission to use SFM logos and testified that SFM was fully aware BRC was utilizing the sprouts.coffee domain name. SFM cannot meet its burden that it is likely to succeed on the merits of its claims (that BRC was wrongfully using its intellectual property) if its own officer testified he gave BRC permission for the use of the logos and that SFM knew BRC owned and was actively using the sprouts.coffee web domain. This testimony alone is sufficient to prevent SFM from prevailing on the merits of its claims.

Moreover, SFM's contention that statements in the press release are "literally false" is also belied by the statements of its own officer (Morton) and also by Roe. Morton testified that he read the "media release. . . and it is accurate and true." [See *Exhibit D*, at ¶ 21]. He also testified that the Harvard assignment referenced in the press release was validated and tested by Sprouts and Sprouts did sell Magnetized water. [Id. at ¶ 22]. Contrary to what SFM would have this Court believe, Morton testified repeatedly that Sprouts did "validate" BRC's unique system and the formula blend and coffee equipment of BRC. [Id. at ¶¶ 18, 19, 22, 23]. Indeed, Morton testified that "Sprouts Farmers Market test kitchen, and data integrity validated everything Jason Roe and Best Roast Coffee represented to Sprouts prior to engaging BRC." [Id. at ¶ 18].

Moreover, contrary to what SFM would have this Court believe, the University of College London feasibility study referenced in the article Sprouts refers to as the "press release" in its Motion and Complaint was conducted at the request of SFM. [See Declaration of Jason Roe, attached hereto as *Exhibit E* at ¶ 4]. In connection with the relationship established between

Best Roast Coffee and Sprouts Farmer's Market, Sprouts commissioned to a nationwide roll-out of the BRC coffee program.  [See Id. at ¶ 5; see also, **Exhibit A** at ¶ 9; see also Email chain between Lisa Oswalt and numerous Sprouts key representatives and Jason Roe discussing the installation of the BRC program being installed in numerous Sprouts locations, attached hereto as **Exhibit G**).  The very fact the parties entered into the business relationship is evidence the parties agreed to the roll out of the BRC coffee program.  Sprouts took a great interest in the water bi-product Magnetized Eart-Water, which was used to make the smoothness of Best Roast Coffee. [See **Exhibit E** at ¶ 6].    And, after commissioning further testing of the water in the Sprouts test kitchen to validate the water, Sprouts later bottled and sold it at Coffee Kiosk locations, which is also confirmed by Morton himself.    [See Id. at ¶ 6; see also, **Exhibit D** at ¶22].

Finally, the press release referenced in SFM's Complaint and Motion was published by "Millenial News Feed", aka ABNewswire—not Best Roast Coffee.  [See **Exhibit E** at ¶ 7].  Sprouts' own "Terms" on its website expressly indicate that "writer[s], blogger[s], journalist[s], [and] educator[s]" may "use the Website contents and Sprouts' names, logos, service marks, and trademarks."  [See Terms and Conditions from Sprouts Farmers Market website, attached hereto as **Exhibit F**, at pg. 1, ¶ 3(b)].  Millenial News Feed falls under any number of those categories, and, as a result, to the extent SFM contends the press release constitutes infringement on their trademark or name, its own terms and conditions on its own website grants Millenial News Feed permission.[1]

---

[1] SFM's own Terms for use of its website and intellectual property on its website contains an express Arbitration provision stating as follows:  Arbitration Provision:  These Terms contain a binding arbitration provision.  You agree that. . . all disputes between you and Sprouts will be resolved by mandatory binding arbitration and you waive any right to participate in a class action lawsuit or class-wide arbitration.  [See **Exhibit F**].  Sprouts own Terms provide that disputes regarding its intellectual property right shall be decided via arbitration, yet SFM is to arguing before this very Court in its Response to BRC's Motion to Compel Arbitration that this case is not subject to arbitration?

### 3. CONCLUSION

SFM's Motion for Preliminary Injunction should be denied.  SFM cannot establish that it is likely to succeed on the merits of its claims.  SFM's own officer contradicts the very basis of SFM's request for a preliminary injunction—i.e., that BRC never had permission to use its intellectual property and that the information contained in the media release is false.  SFM's own officer declares that SFM did grant permission to use the intellectual property and that the information contained in the press release is true.  Strong evidence exists contradicting the very foundation of SFM's Motion, and, as a result, this Court should deny SFM's request for a preliminary injunction.

RESPECTFULLY SUBMITTED this 19th day of September, 2019.

**DENTON PETERSON, P.C.**

/s/ Sterling R. Peterson
Sterling R. Peterson
Larry A. Dunn
1930 N. Arboleda, Suite 200
Mesa, AZ  85213
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of September, 2019, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system which will send notification of said filing to the following CM/ECF registrants.

Isaac M. Gabriel
Christian G. Stahl
Johanna M. Wilbert
QUARLES & BRADY LLP
Two North Central Avenue
Phoenix, AZ 85004
Isaac.gabriel@quarles.com
Christian.stahl@quarles.com
Johanna.wilbert@quarles.com
*Attorneys for Plaintiff*

/s/ Lindsey Rice

# Exhibit A

Sterling R. Peterson, #020628
Sterling@DentonPeterson.com
Larry A. Dunn, #026231
Larry@DentonPeterson.com

**DP** | DENTON PETERSON, PC
ATTORNEYS & COUNSELORS AT LAW

1930 N. ARBOLEDA ROAD, SUITE 200
MESA, ARIZONA 85213
TELEPHONE: (480) 325-9900
FACSIMILE: (480) 325-9901
HTTPS://ARIZONABUSINESSLAWYERAZ.COM

*Attorneys for the Defendants*

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| SFM, LLC d/b/a Sprouts Farmers Market, | Case No. 2:19-CV-04820-JAT |
| Plaintiff, | |
| vs. | **DECLARATION OF JASON ROE** |
| Best Roast Coffee, LLC, a Wyoming limited liability company; and Jason Roe and Jane Doe Roe, husband and wife, | |
| Defendants. | |

I, Jason Roe, state as follows:

1. I am over 18 and competent to testify.

2. I am making this Declaration based upon my personal knowledge of the matters stated herein.

3. I am a Member and Chief Executive Officer of Best Roast Coffee LLC, Defendant in United States District Court. District of Arizona, Case No.2:19-CV-04820-JAT ("Lawsuit"), captioned SFM, LLC DBA Sprouts Farmers Market ("SFM" or "Sprouts") v. Best Roast Coffee LLC ("Best Roast Coffee" and "BRC") and Jason Roe.

4. This dispute arises out of the business relationship entered into between Defendant Best Roast Coffee (and its officers and directors) and Plaintiff Sprouts Farmers Market ("SFM") (and its officers and directors) back in 2015.

5. Both BRC and SFM emphasized healthy living for its customers and appeared to be a natural fit.

6. As a result, in March of 2015 executives from BRC (myself) and SFM began discussions related to putting coffee bars in Sprouts retail stores locations using BRC's trade secret processes and products.

7. In connection with these discussions regarding the placement of coffee bars in SFM locations, and in furtherance of the business relationship, SFM and BRC (and our respective officers and directors) entered into and executed a "Non-Circumvention Agreement" ("the Agreement") in November 2015.

8. The creation of healthy coffee espresso bars utilizing BRC's trade secret processes and products is the Opportunity both parties expressly contemplated when they executed the Agreement.

9. BRC and SFM then proceeded to create over fifty-five coffee espresso bars in Sprouts stores around the country.

10. The Vendor Setup Form was a formality required by SFM so that SFM could issue purchase orders to BRC for its espresso equipment arising out of their business Opportunity/business relationship established by the Non-Circumvention Agreement.

11. A dispute arose between SFM and BRC in late 2017. SFM alleged that some of the equipment it ordered and paid for had not been delivered. BRC denied the allegations. BRC requested SFM to follow the parties' agreement and resolve the dispute through Arbitration.

12. Despite BRC's request that the parties proceed to arbitration as required by the Agreement, SFM filed a lawsuit for breach of contract against BRC in Maricopa County Superior Court, Case No. CV 2017-013906.

13.    BRC and SFM are currently involved in an active arbitration matter before AAA in California, pursuant to Maricopa County Superior Court Judge Hegyi's order requiring us to arbitrate our disputes.

14.    The Non-Circumvention Agreement we entered into formed the very basis of the business relationship between SFM and BRC in which we discussed and agreed to the business Opportunity and jointly set up coffee espresso bars at SFM locations for the purpose of marketing and selling coffee to customers.

15.    BRC and SFM were engaged in business as a result of the Agreement—BRC would have never have entered into the business relationship but for the Agreement.

16.    When BRC and SFM agreed to, and did, install the coffee espresso bars, BRC naturally needed to market those coffee espresso bars and, as a result, it registered the Sprouts.Coffee website.

17.    All of Plaintiffs' claims in this case (i.e., trademark infringement, cybersquatting, false endorsement/advertising) are "related to" and/or "arise out of" the business relationship and Opportunity established in the Agreement.

18.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on this ꞮꞮ day of August, 2019.

_____
Jason Roe

# Exhibit B

Sprouts Legal Department

Date ⁴/¹⁷/¹⁵

Approved ___

## NON-CIRCUMVENTION AGREEMENT

This Non-Circumvention Agreement (this "Agreement") is entered into as of this 9th day of November, 2015, and is by and between Best Roast Coffee LLC ("Presentor") and SFM, LLC d/b/a Sprouts Famers Market ("Presentee"), together with each of Presentor's and Presentee's respective officers, directors, shareholders, agents, employees, consultants, attorneys and affiliates.

### RECITALS

WHEREAS, Presentor has a business investment opportunity which it desires to present to Presentee and any and all other opportunities directly relating to or derived from such opportunity (the "Opportunity"), and intends to assist Presentee with respect to the Opportunity; and

WHEREAS, Presentee is an investor who is interested in participating in the Opportunity; and

WHEREAS, Presentor desires and Presentee agrees that prior to identification of the Opportunity by Presentor to Presentee, each of Presentor and Presentee must agree to certain non-circumvention and nondisclosure covenants contained in this Agreement; and

WHEREAS, Presentee desires to be presented with the Opportunity to acquire the Opportunity and Presentor desires to present the Opportunity to the Presentee subject to the terms and conditions of this Agreement.

NOW, THEREFORE, for good and adequate consideration, the receipt of which is hereby acknowledged, the parties hereto, agree as follows:

### ARTICLE I
### NON-CIRCUMVENTION

Section 1. **Further contacts with the Opportunity (Non-Circumvention).** Presentee agrees not to contact or initiate contact at any time for any purpose, either directly or indirectly, the Opportunity or any officers, directors, shareholders, consultants, attorneys, employees, agents or other affiliates of the Opportunity, or any other property or properties whose identity was revealed through the efforts of Presentor, unless such approval is specifically granted in written form by Presentor on a case-by-case basis. Presentee further agrees not to undertake any transaction or a series of transactions of any kind with the Opportunity or to collect any fees in connection with the Opportunity without the express prior written agreement of Presentor, which agreement may be withheld in Presentor's sole discretion. This prohibition shall be enforced from the date of this Agreement and for a period of three years thereafter.

1

Section 2. **Trade Secrets**. Much of the business information communicated to Presentor by Presentee and by Presentee to Presentor may be trade secrets to such party. Each of Presentee and Presentor agrees to preserve the secrecy of said information. All information which becomes known through the course of business conducted by and between Presentor and Presentee shall be deemed trade secrets only if included on Exhibit A hereto or identified as such by the disclosing party from time to time. Said trade secrets include, but are not limited to, prepared information packages; financials; related documents; names of potential acquisitions, intermediaries, contacts and deal sources; deal structures and financial considerations. Each of Presentee and Presentor agrees to preserve and protect the secrecy and confidentiality of such information and shall disclose same to no third party without the express written permission from the other. This prohibition shall be enforced from the date of this Agreement and for the greater of (a) three years thereafter or (b) as long as such information is deemed a trade secret under applicable law, and shall not apply to information which (i) is or becomes generally available to the public other than as a result of a disclosure by the receiving party, (ii) was available to the receiving party on a non-confidential basis prior to its disclosure by the disclosing party or its representatives, or (iii) can be shown to have become available to the receiving party on a non-confidential basis from a source other than the disclosing party or its representatives.

Section 3. **Applicability of Agreement**. Presentor and Presentee both agree that the provisions of this Agreement extend to the employees and officers of their respective companies/businesses. Said principals further agree to provide the requisite internal security of the subject data within their respective organizations.

ARTICLE II
MISCELLANEOUS

Section 1. **Dispute Resolution**. In the event of any dispute, controversy, or claim related to or arising from the terms of this Agreement, the parties hereto hereby agree that any such dispute, controversy or claim shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. Said arbitration shall be conducted in Orange County, California, by a single, mutually acceptable arbitrator. Such dispute resolution shall be in accordance with the applicable substantive laws of the state of California. The prevailing party shall be entitled to all fees and costs arising therefrom, including, but not limited to, attorney's fees and costs.

Section 2. **Authority**. Each of Presentor and Presentee hereby represents that it has full right, power and authority to execute this Agreement and to perform the actions contemplated hereby. Upon execution of this Agreement, each of Presentor and Presentee hereby binds its

2

representatives and heirs and all subsidiaries and firms affiliated with Presentor or Presentee, as the case may be, under the terms of this Agreement.

Section 3. **Integration and Severability**.   This Agreement constitutes the entire agreement between the parties hereto regarding the transactions contemplated hereby.   In the event a term or terms of this Agreement is/are held to be unenforceable or unlawful, the remaining terms of this Agreement shall continue in full force and effect.

Section 4. **Notices**.  All notices, requests, consents and other communications hereunder shall be in writing and shall be delivered in person or by registered or certified mail, return receipt requested, postage and fees prepaid, or by overnight courier, receipt signature required, or by telecopier transmission, with verification of the transmission received by the sender, to the parties as set forth below or at such other place as either party may, by written notice to the other, direct:

> If to Presentor:
>
> Best Roast Coffee LLC
> 1603 Suite 310, Capital Ave.
> Wyoming 82001
>
> If to Presentee:
>
> SFM, LLC d/b/a Sprouts Farmers Market
> 5455 East High Street, Suite 111
> Phoenix AZ 85054

Any party hereto may change the address designated for mailing by written notice to the other party.  All such notices shall be deemed to be given when delivered in person or telecopied, or if placed in the mail as aforesaid, then four days thereafter.

Section 5. **Counterparts**.  This Agreement may be executed simultaneously in one or more counterparts, including telecopy facsimiles, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

Section 6. **Amendments**.  This Agreement may only be amended, supplemented, or otherwise altered with the express written consent of all parties hereto.

*[Signature page follows]*

3

The Parties hereto, agreeing to be bound, hereby execute this Agreement effective the date first set forth above.

PRESENTOR                                      PRESENTEE

By: _____                    By: _____
Name: _____JASON  ROE_____                   Name: ____Mark  Miale_____
Title: ___CEO – BEST ROAST COFFEE, LLC___        Title: ___SVP Sales + Merchandising___

4

[Signature Page to Non-Circumvention Agreement]

_[signature]_ - CEO  BEST ROAST COFFEE, LLC .  11/09/15

_[signature]_  SVP Sales + Merchandising   11/10/15

5

## **Exhibit A**
## **Trade Secrets**

*Trade Secrets of Presentor*

1) Magnetised water: Including but not limited to quality of water and any water alteration processes, and methods associated with changing the water, structure.

2) Unique Non-carcinogenic: flash roasting and processing of coffee beans, maintaining the integrity and nutrients of the beans.

6

# Exhibit C

| | |
|---|---|
| SFM, LLC dba Sprouts Farmers Markets, a Delaware limited liability company<br><br>Claimant,<br><br>vs.<br><br>Best Roast Coffee, LLC, a foreign limited liability company,<br><br>Respondent. | AAA Case No. 01-18-0003-7370<br><br>Declaration of: Mark Morton |

# Declaration of Mark Morton

**1.** I am at least 18 years of age and I am the *(check one)*: ☐ Claimant ☐ Respondent

☒ Other *(relationship to the people in this case)*: Former employee of Claimant

**2.** I declare: I was a Corporate officer of SFM, LLC dba Sprouts Farmers Markets from 2013 to 2018. In the year 2015 I held the position of Deli Director and my department oversaw the espresso bar and coffee program within Sprouts.

Prior to engaging in any contractual relationship with Respondent, I asked for sprouts attorney Carlos Rojas and his team to review and authorize Respondent's Non-Circumvention Agreement.

It is Sprouts policy that prior to the signing of any binding documents, Sprouts' in-house counsel reviews and authorizes the signing. Only after our attorneys approve such documents for signing, Sprouts' officers are permitted to sign and bind the company.

The legal department gave Mark Miale approval to sign the aforementioned Non-Circumvention Agreement with Respondent. Upon signing, our in-house counsel signed and stamped the Agreement for verification purposes.

Best Roast Coffee was a Sprouts vendor of the retail division headed by Mark Miale and not a vendor of procurement or Steve Hagen's division. Any equipment Mr. Hagen's division procured for the coffee program was billed back to my budget and division.

I first met Best Roast Coffee CEO, Jason Roe, in August 2015 at Sprouts' corporate office and Mr. Miale and myself were presented a feasibility study done for Sprouts on the Cups Per day drinking sector, which Mr. Roe oversaw.

Mr. Miale communicated to Mr. Roe that Sprouts would need to change its model if it were to incorporate espresso, tea and coffee bars to attract the cups per day drinking sector and that decision has to come from higher up within the company.

After review of the proposal it was decided Sprouts will introduce made to order espresso and coffee bars. I gave the directive as Deli Director, to my admin, Nicole Lambeck, to email Respondent the Market Corner Coffee logos for the proposed partnership and private branding of the Best Roast Coffee/Sprouts coffee bar program.

Under my division and Mr. Hagen's division, we purchased espresso machines and a coffee bean blend that was not embraced by Sprouts customers. The coffee model Sprouts built failed, the ideas of Sprouts officers, including myself, lacked the know-how of a coffee expert.

I first tried Best Roast Coffee in Los Angeles where I attended a retail shop with a red banner that read, LA's Best Coffee. Upon trying the coffee, I discovered it was smooth and a completely different level to what Mr. Hagen and myself had tried to put together previously for Sprouts.

We first implemented Respondent's proprietary processes and know-how for the Sprouts Market Corner Coffee Bar located at the La Brea Store 285 in February 2016. Best Roast Coffee introduced Sprouts to the use of two step espresso units instead of the one step Bunn espresso unit Sprout's procurement division had originally used.

Sprouts was also introduced to the term "Air Roasting" and the proprietary process of using the Air Roast as a method of roasting coffee. The Respondent's coffee program equipment package and the coffee model Sprouts was well embraced by Sprouts' customers and Sprouts' CEO.

Four weeks later after seeing the success, Mr. Hagen was determined to cancel the existing orders for the Bunn equipment and switch to the equipment required by Respondent.

At the time, Sprouts had spent a large sum on procuring the ineffective espresso equipment and in exchange for the commitment to do all Sprouts stores new and remodel with Best Roast Coffee, Respondent was asked to replace the Bunn equipment at its own expense with the Unic espresso units utilized by Respondent.

Upon Sprouts unilaterally backing out of the Agreement with Respondent, discussions began regarding the equipment and whether it would need to be paid for because Sprouts pulled out of the Agreement without any proper termination. There was never an agreement between Sprouts and Respondent to give free equipment to attract business. The Agreement was only for Sprouts to license Respondent's proprietary roasting and water filtration processes.

The Air Roast process and the process of magnetizing water to extract espresso remain proprietary processes of Best Roast Coffee. It is not used in any coffee program or kiosk in the United States other than Respondents.

The agreement to install all equipment was agreed to as a contingency of the license, and is explicit in the terms of all espresso machine purchase orders to date. Sprouts had paid for 60 units at the time of termination.

To the best of my knowledge Respondent's business does not sell equipment of any kind as part of its business model.

My department at Sprouts researched the claims being made of Magnetized Water, by testing and validating the water over a period of several months in the Sprouts Farmers Market test kitchen. The Magnetized Water showed perfect symmetry in a frozen crystalline state, compared to other PH bottled water sold at Sprouts, which does not.

In or around September 2016, after an internal whistleblowing event surrounding contaminated water at Sprouts to Mr. Doug Saunders, Chair of SFM Board, Jim Nelson, the COO, and Steve Hagen, made the determination to stop the coffee bar program and cancelled the installation of all current projects.

Separately, Mr. Hagen made plans to find a new equipment provider for the espresso units and coffee program other than Respondent. However, Mr. Hagen still asked for the paid for units to be delivered to storage.

I have read emails in which Best Roast Coffee offered Mr. Hagen and Sprouts the ability to store the equipment at no expense to Sprouts and deliver and install the equipment per the terms agreed upon and in practice between the parties once the breach was cured.

It later was brought to Respondent's attention that Sprouts intended to install the equipment itself and circumvent the Agreement by using another air roast coffee provider and another two step espresso unit provider.

I declare under penalty of perjury under the laws of the state of California that the facts I have provided on this form (and any attachments) are true.

Date: 09/09/2019

MARK MORTON
Print name

## CALIFORNIA   ALL-PURPOSE
## CERTIFICATE OF ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

**State of <u>California</u>**
**County of <u>Los Angeles</u>**

On _09-12-2019_ before me,   **Jeong Koo Rho,** **Notary Public**
personally appeared
_MARK MORTON_
who proved to me on the basis of satisfactory evidence to the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity (ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under **PENALTY OF PERJURY** under the law of the State of California that the forgoing paragraph is true and correct.

**Witness my hand and official seal.**

JEONG KOO RHO
COMM. # 2209847
NOTARY PUBLIC · CALIFORNIA
LOS ANGELES COUNTY
MY COMM. EXP. SEP. 9, 2021

*Notary Public Signature*

(Notary Public Seal)

---

## ADDITIONAL OPTIONAL INFORMATION

**Title or Description of attached document:**
_DECLARATION OF MARK MORTON_

**Document Date :** _9-12-2019_

*Securely attach this document to the signed document with a staple

# Exhibit D

## DECLARATION OF MARK MORTON

I, Mark Morton , declare under penalty of perjury that the following is true and correct:

1.      I am over the age of 18 and competent to make this Declaration.

2.      I am making this Declaration based upon my personal knowledge of the matters stated herein.

3.      My signature appears of the vendor set up form Exhibit A before the court as the corporate officer of SFM who oversaw the department  Best Roast Coffee was in use in 60 Sprouts locations nationwide.

4.      The  Non Circumvention agreement was terms Sprouts Farmers Market agreed to prior to the setup of a vendor account with Sprouts Farmers Market. Sprouts legal department authorised it and sprouts agreed to be bound by the terms if BRC goes ahead and sets up a vendor account. The indemnification form Sprouts is presenting to the court is included as formality in vendor set up and is not intended to dissolve the red stamped legal agreement Sprouts agreed to. The indemnification is sent to all vendors pre signed by Sprouts council with the vendor set up packet.

5.      It is disingenuousness of Sprouts council to suggest that Sprouts was not using BRC program and bound by a very broad arbitration clause Any controversy and claim is subject to Arbitration.

6.      Attached is a true and accurate copy of the documents disseminated to local sprouts stores using the coffee program for instruction on how to make coffee at the coffee bar. The document clearly reads Sprouts Market corner coffee training and procedures are confidential trade secrets of Best Roast Coffee and protected under agreement dated 11/17/15 indicate my understanding as the  officer of Sprouts Farmers market  overseeing Best Roast Coffee that the  indemnification  form has not dissolved the Non Circumvention red stamped legal agreement the court can see initialed by Derik an SFM attorney and member of the AZ state bar. The indemnification is not intended to dishonor anything SFM  agreed to honor prior to the vendor agreeing to register as vendor.

7.    As Head of the Deli Division I authorized Nicole Lambeck to send best Roast Coffee the Sprouts Market corner coffee logo for use in their marketing of the coffee bar.

8.    It was common knowledge in Sprouts that best roast coffee used Sprouts.Coffee and owned it. Sprouts sent purchase orders for new coffee bars to the URL and if there were any issues with coffee, the support email sprouts stores used was ask@sprouts.coffee

9.    The sprouts.coffee web site was a tool to promote the espresso bars inside Sprouts. It was closed down at an extraordinary higher level than day to day Snr Vps and directors when it out performed Sprouts volcanic red coffee in a Sprouts Coffee search for SEO.

10.    It has more recently come to my attention in the 2019 proxy statement of Sprouts that a board member of Sprouts had an ownership interest in Volcanic Red Coffee.

11.    The board member who owns volcanic red coffee, together with Sprouts CFO COO and several others at Sprouts are in media reports as resigning from sprouts.

12.    The attack of BRC only happened after the BRC internal escalation of a serious matter that had potential to cause SFM brand reputation and harm to the Board.

13.    As CEO of Bet Roast Coffee Jason Roe was disturbed that the COO and others in Sprouts would not at the very least consider turning off the water tap spraying produce and my delie meats after seeing a world class water lab report gathered by Sprouts Michael Lanzieo at my instruction results came in.  It came to Mark Miele and my  attention the  water spraying onto consumers had potential to have lead and arsenic according to the lab test results and water may not be safe.  Mark Miele passed the lab results onto COO Jim Nelson. BRC found it disturbing COO Mr Nelson or Mr Hagen in procurement did not  consider turning off the water tap spaying consumers food until SFM could check the water was safe as lab tests given to Mr Nelson showed the water to have arsenic and lead, and perceived may not safe to spray for consumers food. Mr. Roe as BRC CEO escalated to the Sprout's board the  presence of the water lab reports, and circumstances officers in SFM were aware of the water lab reports and as yet not checked the water

safety. The action of BRC brining the circumstance to Sprouts board attention, had a negative impact on the Sprouts COO. In following days Mr. Nelson as Sprouts COO gave me instructions as Deli Director of Sprouts to hold off on the coffee program and the new coffee bar installations. Such direction under the normal chain of command is Mark Miale as Snr Vp determination and COO does not usually make the decisions hands on.

14. The fact nobody turned off the tap until the water could be checked and determined to be safe I witnessed left best roast coffee CEO very unsettled, ultimately on Sept 20th 2016 Mr. Roe as CEO of Best Roast Coffee blew the whistle to the SFM Chair of the Board.

15. Days after that SFM canceled the coffee bar installs

16. On the day of the whistleblowing event SFM corporate officers were advised not to talk to the Vendor BRC with the threat of termination if we did talk to the whistle blower.

17. Everything BRC presented to SFM Mark Miele and myself contained in the UCL feasibility study in 2015 has come true. It is Sprouts retail division position that BRC was authentic has a good reputation.

18. Sprouts farmers market test kitchen, and data integrity validated everything Jason Roe and Best Roast Coffee represented to Sprouts prior to engaging BRC. This process is protocol and practice for SFM, as a public company.

19. BRC has its own formula blend of coffee beans mixed from various regions and owns its own registration of coffee bean blend as was validated by SFM data integrity in the onboarding process of BRC and submission of BRC bar codes.

20. To raise a claim Sprouts found out Best Roast Coffee was not who they say they are, I perceive as disingenuous, and is in conflict with sprouts test kitchen research and SFM data integrity. Sprouts senior officer COO only changed his position on BRC, after the September 20th event as a result of the event and as Snr Deli Director I perceive the decision had no genuine basis. As Snr Director of deli of Sprouts the day to day decision maker for the department I wished to

continue with the innovation and merits of BRC, as the organic program was aligned with Sprouts vision and brand values.

21.   The attached media release exhibit 3 I have read and it is accurate and true.

22.   The harvard assignment I have read and as an officer of Sprouts that managed BRC it is accurate and true too, Sprouts did validate test and sell Magnetized water.

23.   The coffee equipment on the purchase order has magnetized water present. This system validated by Sprouts is a unique process to BRC and only uses as part of BRC coffee program, no other coffee company in USA uses the process but for the BRC coffee program. Sprouts used the Magnetized Water at the coffee bars it is unique know how to BRC.

24.   Prior to using Air Roast coffee and two step espresso machine Sprouts was using traditional drum roast and a one step machine. The know how to order air roast coffee, and continue to use air roast coffee and two step espresso was given to SFM by BRC.

25.   I read the Non Circumvention agreement. There is no provision or exit clause in the Non Circumvention Agreement SFM attorneys authorized Mark Miale to sign on behalf of Sprouts.

I hereby declare under penalty of perjury under the laws of the state of California and Arizona that the facts I have provided on this form and any attachments are true.

Signed at

Date:   9/12/19

Mark Morton

RS 12-23-15

**VENDOR SETUP FORM - COGS**

Revised 10/22/2015

The following forms MUST be also submitted
- ☑ W-9 Form
- ☑ Store Delivery Listing (DSD Vendors Only)
- ☑ Indemnification Agreement
- ☑ Certificate Liability Insurance
- ☑ Sample Invoice

**SPROUT'S FARMERS MARKET**

5455 E. High Street
Suite 111
Phoenix, AZ 85054

phone: 480.814.8016
fax: 480.814.8017

Vendor Status  ☑ New  ☐ Information Update

## Vendor Information
Vendor Type: ☐ Warehouse  ☑ DSD (Direct to Store)

| | |
|---|---|
| Vendor Name | Best Roast Coffee, LLC |
| Contact Person | Jason Roo |
| d/b/a or Other Business Name | |
| Title | CEO |
| Address | 10814 - 10818 Jefferson Blvd |
| City | Culver City |
| State | CA |
| Zip Code | 90230 |
| Phone | 9492726663 |
| Fax | 949 257 0333 |
| Email | jason@bestroast.coffee |

### Remittance Information
| | |
|---|---|
| Address | 10818 Jefferson Blvd |
| City | Culver City |
| State | CA  Zip Code  90230 |
| Payment Terms | 100 % net 7days |
| Blank or Zero Terms Default to 30 Days | |
| Federal Tax ID# | |

### Accounting Contact Information
| | |
|---|---|
| AP Contact Name | Julia Yim |
| Phone | 3108764605  Fax |
| Email | julia@bestroast.coffee |
| AR Contact Name | OR  Laziff Clezzar, CPA, MBA  465 E UNION ST. STE # 207, PASADENA, CA 91101 |
| Phone | 626 405 0213 |
| Email | lchagpar@gmail.com |

### Customer Service Contact Information
| | |
|---|---|
| Contact Name | Jeremy Minski  Service Hours |
| Phone | 8182985839  Fax |
| Email | jeremy@bestroast.coffee |

### Rep/Broker Information
| | |
|---|---|
| Rep Name | Company Name |
| Address | |
| City | State  Zip Code |
| Phone | Fax  Email |

### Vendor Authorization Signature
| | |
|---|---|
| Name | Jason Roo |
| Title | CEO |
| Signature | |
| Date | 12/14/2015 |

The information supplied on this form is true and accurate to the best of my knowledge.
I understand that submission of this form does not guarantee authorization of my product and that delivery of unauthorized product will result or refusal.

### Order/Receiving Information
| | | | |
|---|---|---|---|
| Minimum Order | 1  Cases (Select One) | Maximum Order  20,000  Pounds (Select One) | Lead time  7days (in calendar days) |
| EDI Orders | ☐ Yes ☑ No | EDI Contact  EDI Phone | EDI email |
| Electronic Receiving | ☐ Nex Invoice | ER Contact  ER Phone | ER Email |

### Warehouse Information (warehouse vendors only)
| | |
|---|---|
| FOB Point Sprouts Warehouse | ☐ Yes ☑ No |
| Warehouse | |
| Address | |
| City | State  Zip |
| Pickups Allowed | ☐ Yes ☑ No |
| Phone | |
| Contact | |

One Way Pallets ☐ Yes ☐ No  Chep Pallets ☐ Yes ☐ No  Slip Sheets ☐ Yes ☐ No

☑ I am interested in participating in in-store demos  ☑ I am interested in advertising & promotional opportunities

### SPROUT'S OFFICE USE ONLY

Bill Back Manager Vendor: ☐ Yes ☑ No
Fintech Liquor Vendor: ☐ Yes ☑ No

**Sprouts' Approval Signatures:**
Submitter Signature: Mark Marton
Submitter Name (printed): 
Date: 12/18/15
Dept Director Signature: 
Date: 12/18/15
Dept Director (Printed):

**AP Office Use Only:**
A/P Vendor #

**Warehouse Information:**
- ☐ Colton, CA Warehouse
- ☐ Dallas, TX Warehouse
- ☐ Phoenix, AZ Warehouse

**Internal Distribution:**
- ☐ 1. Accounting
- ☐ 2. System Entry
  - WMS Entry (Warehouse)
  - HQ Entry (Data Integrity)
- ☐ 3. Notified Submitter Vendor is Setup

Version 01.24.2014

TRUE AND ACCURATE, USED in Sprouts locations in Coffee Bars

SPROUTS MARKET CORNER Coffee

— ESTD 2002 | —

Sprouts Market Corner Coffee training and procedures are Confidential Trade Secrets of Best Roast Coffee, Llc protected under agreement by SFM, Llc 11/17/15

MARK MOZTENO   9/11/19   SERVICE DELI DIRECTOR



84°        (/weather)

---

PRESS RELEASE

## Best Roast Coffee "Revs up" Expansion into Luxury Car Sector.

"Porsche enthusiast, BRC CEO, Jason Roe shows the new color 911 Turbo. High-end car brands should provide high-end specialty coffee, says Roe."Big box grocery and retail 3rd wave organic specialty coffee solution...

Monday, July 8th 2019, 8:55 PM EDT

*Big box grocery and retail 3rd wave organic specialty coffee solution provider,*
*Best Roast Coffee opens its 3 feet Tea Coffee Juice bar organic retail model to high-end luxury car brands. A*
*premium car brand deserves a premium coffee.*



(http://www.abnewswire.com/uploads/15

Premium specialty organic coffee company, Best Roast Coffee (BRC), known for a unique proprietary blend of coffee, the performance defining component that led to being awarded twice the winner of Los Angeles best coffee, will now open its big-box grocery 3 feet made-to-order espresso bar solution, to premium car brands. Speaking at the May 2019 opening of a new Los Angeles location now serving Best Roast Coffee, CEO Jason Roe announced, BRC will open the BRC made to order organic coffee tea and juice kiosk solution to the luxury car sector. The establishment of an immediate 16 Coffee kiosks inside car dealerships, and further discussions of six hundred potential new organic coffee bar locations, coast to coast across the USA. The luxury car brand will brand our coffee, as their brand coffee, said Roe.

*"Porsche enthusiast, BRC CEO, Jason Roe shows the new color 911 Turbo. High-end specialty coffee, says Roe."*

Mr. Roe, himself a Porsche enthusiast, has a car from the first-ever world production run to be sprayed with Miami Blue. When getting the car serviced, Mr. Roe experienced what he considered, a mediocre cup of coffee. "It is then I had the vision," says Roe. "I saw the brand disconnect. I studied causality with Harvard business school. "The customers BRC is attracting to retail are caused to attend the retailers for a natural organic energy boost, attracted to our organic coffee blend and quantum water for their natural energy solution. The reverse can be applied to the luxury high-end car dealership. The cause of a customer not to want the coffee; their desire to drink a premium organic coffee. BRC is, therefore, the high-end car dealership solution for better customer experience," says Roe.



*CEO Best Roast Coffee, Jason Roe outside his Los Angeles Coffee shop IMC. Twice winner of Los Angeles Best Coffee. The shop featured in the Hollywood Movie "*A Kind of Magic (https://www.youtube.com/watch?v=L6Cpdp29ImE&frags=pl%2Cwn)*".*

There is nothing conventional about BRC and how it formed and expanded into 60 big-box grocery locations in just 5 months to use the BRC process. To begin with, BRC is the culmination of a University College London (https://en.wikipedia.org/wiki/University_College_London) feasibility study, done for Sprout's Farmer's Market ("Sprouts") in 2015, a real-life UCL, Ms assignment project. UCL, recognized as a top 5 world-ranked university of the world, attended by world-renowned names, Mahatma Gandhi, and Alexander Graham Bell. Mr. Roe is credited with being an inspirational real-life CEO mentor to the UCL students for their 2015 Ms project. Following the UCL program feasibility study, Sprouts, in 2016 tried the proposed BRC program at its Le Brea location," said Mr. Roe. Four weeks later, Sprouts decided to commission a nationwide roll-out of the BRC coffee program, introducing the performance defining component BRC coffee and its processes to their existing Sprouts store remodels, and into the new Sprouts stores as the grocery chain expanded". Sprouts took a great interest in the water bi-product Magnetized Earth-Water, used to make a Best Roast Coffee smooth. After commissioning further testing of the water in the Sprouts test kitchen to validate the water, Sprouts later bottled and sold it at Coffee Kiosk locations. "Interestingly, today the same corporate executive from Sprouts is now a corporate executive at a competing big-box grocery chain," said Mr. Roe. I was invited to meet with him again. The idea is to introduce the water innovation into that grocery chain now for it to capitalize on too. The magnetized water when applied to fresh produce extends the shelf life of the fresh produce and will reduce shrink waste, potentially recapturing millions of dollars per year for a big-box grocery chain.

Roe said "When a company and its people can find comfort in the uncomfortable and unconventional, it will allow new ideas or processes to emerge. If Fortune 500 companies change the culture in the right direction, they realize their new potential, and may even merge into Fortune 100 status. On the other hand, if fortune 500 companies, after becoming public remain fortune 500 companies, it would seem to indicate the company leadership is doing more of the same thing never truly realizing its full potential. I prefer the unconventional says, Roe. Culture has changed around the planet, influenced by the Millennials who subscribe to unconventional too and the belief that like-thinkers and energy attracts. You can see successful people pictured together, this indicates there may be merit subscribing to such a thought. "A common thread that binds all successful leaders and companies is innovation, in product or thinking," said Mr. Roe. At one stage or another, all the stand out CEO's has thought of something nobody else has ever done. One such example of Mr. Roe's thinking is when BRC refused to sell coffee beans to take home. The average business leader would see it as a lost sale opportunity. Mr. Roe CEO lens allows him to recognize the BRC

blend of coffee beans as the companies "performance defining component". He likened it to KFC. "If you can convince KFC to sell raw chicken and its formula to take home and cook, then I will sell my formula coffee beans," says Roe. Nobody in the Coffee industry thinks like Mr. Roe.



*Jason Roe and Richard Branson on Sprouts Market Corner Coffee Facebook page. Innovative thinkers talking with each other as they – walk through Denver, Colorado Airport with the press out in front.*

Mr. Roe talks of real-life examples of people he has met and conversed with to further support his point. "I met AZ Governor Doug Ducey last month," said Roe. Governor Ducey is recognized not only for his economic reform but in business Cold Stone Ice Creamery that he took worldwide. "Sir Richard Branson, an innovator too. He and I first met in Tasmania, Sir Richard flew in dressed as Tasmania Devil, my kind of leader. We connected again in Denver Colorado too" said Mr. Roe. Asked who is his greatest business influence, "I would have to say, Clayton Christensen, Harvard Professor." "Studying his insight, compelled me and all his students in our Harvard Business course to think more. The insight and discussion I truly enjoyed, his teachings compelled me to look at business and corporate strategy through a different lens. It is not the first time Mr. Roe looked at something different.  When the CEO saw the water filters in reverse osmosis, he was able to perceive that water passing water through the filters may remove chemicals, but at an atomic level, the water is ripped apart is the process. Mr. Roe viewed the water as broken and destroyed. Roe says "we all walk in a North and South pole, magnetic force every day. It is an invisible force

that binds our cells and holds humans together. In order to return the atomic structure to filtered water, it needs a specialized confluence of the same magnetic push and pull energy, applied" In 2016, a non-fiction e-book, "The Force is in You – Magnetized Water for A magnetized Human", written and published worldwide in 2016 about Magnetized Earth-Water innovation.



*Progressive thinkers, CEO of BRC Jason Roe and AZ Governor Doug Ducey Connect.*

CEO of Best roast coffee looks through his unique lens at retail today Mr. Roe says "We witness all brands of coffee beans; Star Bucks, Pete's, McCafé, whatever, the brand you want, you can take the coffee beans home or purchased online, through forward-thinking of BRC, you cannot take, Best Roast Coffee home. Such a thing is a BRC competitive strength, and that too is a retail's strength. It offers retailers a solution too. BRC has truly created causality, consumers have to come out into the retailer shop to experience the best coffee. "I believe retail can survive the online insurgency threat, by using what online marketplaces don't have and capitalizing on the strength of four walls and a roof, leveraging that to an advantage. We might be able to buy a dress online, but we can't connect with friends and family in person with free Wi-Fi, music, and fresh air all in a social atmosphere while having a coffee, a Best Roast Coffee nobody can buy online! There is no greater draw-card than the human spirit so introduce food and beverages in the clothing shop, or grocery store, find the room for tables and chairs and encourage social gathering, hug your friend and hug a smooth performance defining blend of coffee, that nobody can make from home – It's best Roast Coffee.

Media Contact
**Company Name:** Millennial News Feed (http://www.abnewswire.com/companyname/bestroast.coffee_48253.html)
**Contact Person:** Korey Andersen
**Email:** Send Email (http://www.abnewswire.com/email_contact_us.php?pr=best-roast-coffee-revs-up-expansion-into-luxury-car-sector)
**Country:** United States
**Website:** www.bestroast.coffee (http://www.bestroast.coffee)

Press Release Distributed by ABNewswire.com (http://www.abnewswire.com)

To view the original version on ABNewswire visit: Best Roast Coffee \"Revs up\" Expansion into Luxury Car Sector. (http://www.abnewswire.com/pressreleases/best-roast-coffee-revs-up-expansion-into-luxury-car-sector_406699.html)

# Exhibit E

Sterling R. Peterson, #020628
Sterling@DentonPeterson.com
Larry A. Dunn, #026231
Larry@DentonPeterson.com

**DP | DENTON PETERSON, PC**
ATTORNEYS & COUNSELORS AT LAW

1930 N. ARBOLEDA ROAD, SUITE 200
MESA, ARIZONA  85213
TELEPHONE: (480) 325-9900
FACSIMILE: (480) 325-9901
HTTPS://ARIZONABUSINESSLAWYERAZ.COM
*Attorneys for the Defendants*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| SFM, LLC d/b/a Sprouts Farmers Market, | Case No. 2:19-CV-04820-JAT |
| Plaintiff, | |
| vs. | **DECLARATION OF JASON ROE** |
| Best Roast Coffee, LLC, a Wyoming limited liability company; and Jason Roe and Jane Doe Roe, husband and wife, | |
| Defendants. | |

I, Jason Roe, state as follows:

1.    I am over 18 and competent to testify.

2.    I am making this Declaration based upon my personal knowledge of the matters stated herein.

3.    I am a Member and Chief Executive Officer of Best Roast Coffee LLC, Defendant in United States District Court. District of Arizona, Case No.2:19-CV-04820-JAT ("Lawsuit"), captioned SFM, LLC DBA Sprouts Farmers Market

("SFM" or "Sprouts") v. Best Roast Coffee LLC ("Best Roast Coffee" and "BRC") and Jason Roe.

4.      The University of College London feasibility study referenced in the article Sprouts refers to as the "press release" in its Motion and Complaint was conducted at the request of Sprouts Farmer's Market who did not have a coffee bar at the time (reference SFM officer Mark Morton declaration) Sprouts needed a feasibility study in order for the public company to determine to change its model.

5.      In connection with the relationship established between Best Roast Coffee and Sprouts Farmer's Market, Sprouts did commission to a nationwide roll-out of the BRC coffee program.

6.      Sprouts did take a great interest in the water bi-product Magnetized Eart-Water, which was used to make the smoothness of Best Roast Coffee.  And, after commissioning further testing of the water in the Sprouts test kitchen to validate the water. Sprouts later bottled and sold it at Coffee Kiosk locations. This was recently highlighted in a Harvard Assignment (Exhibit C) which shows pictures of the magnetized earth water on sale in Sprouts.

7.      The press release referenced in SFM's Complaint and Motion was published on CNN and ABC by "Millennial News Feed", using their third party provider ABN Newswire. — Not edited or published by Best Roast Coffee.

8.      Sprouts Farmers Market web site terms and conditions  (Exhibit B) reads "Additionally, if you are a writer, blogger, journalist, educator, or student, you may download, copy, and use the Website's contents and Sprouts' names, logos, service marks, and trademarks that appear on the Website (together, "Sprouts Marks") solely for purposes of including those items in articles or <u>academic materials,</u> as applicable, created or prepared by you for purposes of your work as a <u>writer,</u> blogger, <u>journalist</u>, educator, or student grants use of its IP and trade

marks to Media Blog, School publications, are granted free right of use to Sprouts Farmers Market under terms and conditions listed on its web site.Terms include a valid arbitration agreement.

9.     Harvard assignment (Exhibit C) falls under category of academic, and thus under the terms of Sprouts Farmers Market Website.

10.    Millennial News Feed as seen in exhibit 3 of Mark Mortons statement falls under Media and thus under the terms of SFM web site.

11.    As the CEO of Best Roast Coffee, I declare that I am a writer (under Sedum) with Non Fiction ebook published on Amazon and Apple iBooks in approx. 80 countries world wide. I am also presenter of the Harvard assignment, and recently graduated "Harvard Disruptive Strategy" under professor Clayton M Christensen as the news story presented to the court accurately reads.

12.    Were the court to restrict BRC from reference to Sprouts, a parallel characterization may be likened to asking a graduate of a university not to display the university on their linkedin profile page.

13.    Terms and conditions clause of the Sprouts Web site 19**A. Applicability reads "**You agree that Any dispute, controversy or claim arising out of, or relating to, these Terms (including the breach, termination, enforcement, interpretation, <u>or validity of these Terms</u>) (together, "**Disputes**") will be resolved by confidential and binding arbitration on an individual basis as described in these Terms (this "**Arbitration Agreement**")

14.    Clause 19 A also reads "But, in the event of any actual, alleged, or threatened violation of confidentiality or violation of Sprouts' intellectual property or other proprietary rights, Sprouts may immediately resort to court proceedings in a court of **<u>competent jurisdiction</u>** in order to seek immediate injunctive relief without posting bond, proving damages, or meeting any similar requirement" such language seems to be in conflict.   BRC would argue 9

3

U.S.C.A. §§ 2 - 4. The United States Supreme Court has recognized that the FAA "manifest[s] a liberal federal policy favoring arbitration agreements. Moreover there is no evidence of 'A threatened violation or violations' of Sprouts intellectual property that warrants the exercising this questionable provision court can issues orders other than to Arbitrate when a valid agreement to Arbitrate exists.

15.     Sprouts argues for  Arbitration. When SFM was  a party to a petition for certiorari filed by the National Labor Relations Board (NLRB) Sprouts asking the Court to overturn a lower court ruling enforcing Sprouts' arbitration clause and class action waiver. Petition for Writ of Certiorari, *NLRB v. SF Mkts*., 2016 U.S. S.Ct. Briefs LEXIS 4770 (U.S. Dec. 22, 2016). On May 29, 2018, eight days after deciding *Epic Systems,* the Supreme Court denied certiorari, thereby upholding the Sprouts waiver. *NLRB v. SF Mkts*, No. 16-801, 2018 U.S. LEXIS 3300 (U.S. May 29, 2018), cert. denie

16.     Clause 19B of Sprouts Farmers Market terms and conditions further identifies assigns the Arbitrator as having the power to grant inductive relief and reads;  "arbitrator may grant injunctions or other relief in such dispute or controversy", evidence  not only is there agreement to arbitrate present, but the Arbitrator is specifically assigned inductive remedy.

17.     I  declare under penalty of perjury under the laws of the United States of America to the best of my knowledge that the foregoing is true and correct.

Executed on this 18th day of August, 2019.

_____
Jason Roe

# Exhibit H

# TERMS

Last Updated: January 30, 2018

These Sprouts Terms of Use ("Terms") are between Sprouts Farmers Market, Inc. (together with its affiliates, "Sprouts," "we," "us," or "our") and the person who is accessing or using this website, made available by Sprouts ("Website"). These Terms govern your access to and use of this Website.

By accessing or using this Website, you, on behalf of yourself and any company that you represent (together, "you"), are agreeing to comply with and be bound by these Terms and our Privacy Policy. Please ready these Terms and our Privacy Policy carefully. If you do not agree to These Terms or our Privacy Policy, do not access or use the Website.

You represent that you are a natural person over eighteen (18) years of age. You further represent that you may legally enter into these Terms and that you agree with these Terms.

Sprouts may change these Terms, including Sprouts' Privacy Policy, at any time. Sprouts will post all such changes on the Website and all changes will be effective immediately upon posting. Material changes will be conspicuously posted on the Website. By accessing or using the Website after changes are posted, you agree to those changes. You agree to review these Terms and Sprouts' Privacy Policy frequently in order to notify yourself of any changes.

**ARBITRATION NOTICE:** These Terms contain a binding arbitration provision. You agree that, except for certain types of disputes described in the arbitration provision below, all disputes between you and Sprouts will be resolved by mandatory binding arbitration and you waive any right to participate in a class action lawsuit or class-wide arbitration.

## 1. Privacy Policy.

The information you provide by accessing and using the Website, as well as other information we collect from your use of the Website, will be handled according to our Privacy Policy. Sprouts' Privacy Policy describes how your personal information and other information is collected, used, and shared and is hereby incorporated by reference into these Terms. You should read our Privacy Policy and stay familiar with its terms.

## 2. Intellectual Property Rights.

This Website, including its text, audio, video, graphics, charts, photographs, interfaces, icons, software, computer code, data, trademarks, logos, slogans, names of products and services, documentation, other components, content, and tools, and the design, selection, and arrangement of content is exclusively the property of Sprouts or, as applicable, its third-party vendors and licensors. The Website may contain references to third-party marks and copies of third-party copyrighted materials, which are the property of their respective owners. The Website is protected by copyright, trademark, and other intellectual property laws. Any unauthorized use of any trademarks, trade dress, copyrighted materials, or any other intellectual property belonging to Sprouts or any third party is strictly prohibited and may be prosecuted to the fullest extent of the law. There are no implied rights or licenses granted to you or any other person in these Terms.

Copyright © 2018 Sprouts Farmers Market, Inc. All rights reserved.

## 3. Use of the Website.

**A. Personal Use.** Except as may be otherwise expressly permitted by these Terms, you may download and print one copy of the Website's visible content only for your own personal non-commercial use, provided you do not modify or delete any copyright, trademark, attribution, or proprietary notices.

**B. Limited Additional Uses.** Additionally, if you are a writer, blogger, journalist, educator, or student, you may download, copy, and use the Website's contents and Sprouts' names, logos, service marks, and trademarks that appear on the Website (together, "Sprouts Marks") solely for purposes of including those items in articles or academic materials, as applicable, created or prepared by you for purposes of your work as a writer, blogger, journalist, educator, or student, provided that you do not remove any copyright, trademark, attribution, proprietary, or other notices in or on those items, that you attribute the Website contents and Sprouts Marks to Sprouts as may be required by Sprouts, and that you use those contents and Sprouts Marks in compliance with applicable laws and regulations.

YOU UNDERSTAND AND AGREE THAT YOU WILL NOT USE SPROUTS MARKS ON OR WITH ANY GOODS OR SERVICES AND WILL NOT USE SPROUTS MARKS TO INDICATE THE SOURCE OR ORIGIN OF ANY GOODS OR SERVICES. YOU FURTHER AGREE NOT TO ALTER OR MODIFY SPROUTS MARKS IN ANY WAY, FOR EXAMPLE, BY CHANGING THE COLORS OR DIMENSIONS OF ANY SPROUTS LOGO. If so required by Sprouts, you will use Sprouts Marks only together with notices as Sprouts may from time to time require, including without limitation the ® or the ™ symbols.

You understand and agree that the rights granted herein are fully revocable by Sprouts, with or without notice. If Sprouts revokes your rights, or terminates these Terms, your rights with respect to the Website's contents and Sprouts Marks are immediately terminated. In such case, you will immediately cease all copying, distribution, and other use of the Website contents and Sprouts Marks, you will promptly remove the Website contents and Sprouts Marks from any materials in your possession or control, and you will promptly confirm to Sprouts in writing that you have done all of the foregoing.

## 4. Limitations on Use; Compliance with Laws.

Your use of the Website must conform to the following:

**1.** Your use of the Website will at all times comply with all applicable local, state, and federal laws, rules and regulations. You may not use the Website for unlawful purposes.

**2.** You will not copy, reproduce, display, duplicate, redistribute, sell, publish, post, license, rent, modify, translate, adapt, reverse-engineer, or create derivative works of any part of the Website, or any materials appearing on or visible through the Website, except as otherwise expressly permitted by these Terms without the prior written consent of Sprouts.

**3.** Unless you operate a legitimate internet search engine, you agree not to use or launch any automated system, including without limitation, "robots," "spiders," "scrapers," web crawlers, indexing agents, and other automated programs and devices to access, use, or copy any portion of the Website.

**4.** You will not obtain or attempt to obtain any personally identifiable information from any other users or third parties from or using the Website.

**5.** You agree not to circumvent, disable, or otherwise interfere with security-related features of the Website. User activities that aim to render the Website or associated services inoperable or to make their use more difficult are prohibited.

**6.** You may not use the Website to post or transmit any material that contains any viruses, Trojan horses, worms, time bombs, cancelbots, malware, adware, or other computer programming routines that may damage, interfere with, surreptitiously intercept, or expropriate any system, personal information, or other data.

**7.** You will not impersonate any third party or interfere with any third party's use of the Website.

**8.** You will not submit inaccurate information via the Website, commit fraud or falsify information in connection with your use of the Website, or act maliciously against the business interests or reputation of Sprouts.

## 5. Your Sprouts Customer Account.

You may use the Website as a guest, but you will not be able to use all features of the Website. You will be required to either set up an online Sprouts customer account or log into the Website using your Facebook, Twitter, or Google+ account in order to use or redeem mobile coupons, to order catering services using the Website, to save recipes, to create shopping lists, and to use certain other features of the Website. You will be required to submit certain information to set up your account and will be required to establish a username and password. You are responsible for complying with all applicable laws, regulations, and policies of all relevant jurisdictions, including all applicable local rules regarding online conduct in connection with your Sprouts customer account. Sprouts will presume, and you warrant, that any information received from or about you through your access to or use of the Website, including through the Sprouts customer account creation process, is accurate, complete, current, and authorized by you. You agree not to contest the validity and binding legal effect of those communications and information. You understand and agree that perfect security does not exist anywhere, and you will therefore protect your personal information and information associated with your Sprouts customer account, including without limitation your username and password, in a reasonable way at all times. You will not transfer your Sprouts customer account to or share your Sprouts customer account with any other person. Your Sprouts customer account is personal to you. You will promptly notify Sprouts of any unauthorized use of your Sprouts customer account or Website contents that becomes known to you.

## 6. Mobile Coupons & Checkout Challenges.

If you have an online Sprouts customer account you may download, clip, and print mobile Sprouts coupons from the Website, save those coupons to the myEasyScanBarcode, and use and redeem those coupons at Sprouts retail stores. Your use and redemption of mobile coupons is subject to our Mobile Coupon Terms, any rules contained in or on the coupons, and other terms as may be made available from time to time by Sprouts.
From time to time Sprouts will make available "Checkout Challenges," which enable you to earn check marks by purchasing qualifying products. Once all of the products required by a given Checkout Challenge are purchased as evidenced by Sprouts' records, certain mobile coupon(s) will be unlocked. Checkout Challenges may be subject to additional terms.

## 7. Sweepstakes & Promotions.

To participate in any sweepstakes or promotions that Sprouts may make available, you may be required to provide additional information. Additional terms and eligibility criteria may apply to your participation.

## 8. Order and Payment Information; Gift Cards.

You may order catering services using the Website but catering services must be paid for at the applicable Sprouts store location. Purchases of gift cards made through the Website must be made by credit or debit card. Gift card purchases are subject to the terms of our gift card provider, Transaction Wireless, doing business as First Data, which are located here. Information about our collection and use of payment-related information is described in our Privacy Policy. If the credit or debit card information that you submit is incorrect or invalid, your payment will not be processed. We have no responsibility or liability if your credit or debit card is declined by your financial institution. Payments are processed by our PCI-compliant third-party payment processor. Refunds, if available, are solely the responsibility of Sprouts and are at Sprouts' sole discretion.

## 9. Product, Program, and Service Availability.

Any products, programs, or services that may be mentioned in the Website (for example, catering services) are subject to availability and terms not described in these Terms may apply. Available catering services may change at any time without notice to you. Prices for catering services remain valid while they are listed and offered via the Website. Prices will be as posted on the Website as of the date and time of your order, as applicable. Availability of products and services

may be limited. Some products and services may not be available in certain areas. Sprouts may change the programs, products, and services mentioned on the Website at any time without notice. You agree that Sprouts may add to, delete from, and modify the Website at any time without notice and without permission from you or any third party.

## 10. Career Opportunities.

The Website may allow you to submit job applications (including uploading a resume and other materials) for posted career opportunities at Sprouts. You will not submit a job application or upload a resume or other materials for any person other than yourself. You warrant that all information contained in any job application, resume, and other materials you provide is current, accurate, and complete. Your submission of a job application does not in any way require Sprouts to review materials or consider you for employment. Career opportunity descriptions on the Website are subject to change at our sole discretion without notice.

## 11. Term.

These Terms will continue until terminated by you or Sprouts as permitted by these Terms. You may terminate these Terms at any time and for any reason or no reason by ceasing all access to and use of the Website and its contents. Sprouts may terminate these Terms and your access to and use of the Website at any time and for any reason or no reason, without notice or liability, including if you breach these Terms. Upon any termination of these Terms you must promptly cease accessing and using the Website. Any provisions of these Terms that are intended to survive termination (including without limitation any provisions regarding indemnification, limitation of our liability, and dispute resolution) will continue in effect beyond any termination of these Terms or of your access to or use of the Website.

## 12. DISCLAIMER OF WARRANTIES.

SPROUTS PROVIDES THE WEBSITE ON AN "AS IS" AND "AS AVAILABLE" BASIS, WITHOUT ANY WARRANTY OR ASSURANCES OF AVAILABILITY OR USABILITY OF ANY KIND. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, SPROUTS HEREBY DISCLAIMS ALL WARRANTIES, EXPRESS, IMPLIED, STATUTORY, ARISING FROM COURSE OF DEAL, USAGE OR TRADE, OR OTHERWISE, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF MERCHANTABILITY AND THOSE REGARDING FITNESS FOR A PARTICULAR PURPOSE, AVAILABILITY, QUALITY, ACCURACY, COMPATIBILITY WITH ANY STANDARDS OR USER REQUIREMENTS, NON-INFRINGEMENT, AND TITLE.
SPROUTS DOES NOT WARRANT THAT THE WEBSITE WILL BE UNINTERRUPTED OR ERROR-FREE OR THAT ANY DEFECTS IN THE WEBSITE WILL BE CORRECTED. SPROUTS IS NOT RESPONSIBLE FOR ANY CONTENT, PROGRAM, TOOL, OR APPLICATION IN CONNECTION WITH THE WEBSITE OR FOR ANY ACTION TAKEN IN RELIANCE THEREON. IN ADDITION, SPROUTS WILL NOT BE LIABLE TO YOU FOR ANY INTERCEPTION OF ONLINE COMMUNICATIONS, SOFTWARE OR HARDWARE ISSUES (INCLUDING WITHOUT LIMITATION VIRUSES, OTHER HARMFUL CONDITIONS OR COMPONENTS, LOSS OF DATA, AND COMPATIBILITY CONFLICTS), OR OTHER CONSEQUENCES OF YOUR ACCESS TO OR USE OF THE WEBSITE. SPROUTS HAS NO RESPONSIBILITY FOR THE TIMELINESS, DELETION, MISDELIVERY, OR FAILURE TO STORE ANY USER COMMUNICATION.
YOUR USE OF THE WEBSITE IS AT YOUR OWN RISK AND YOU, ALONE, ARE RESPONSIBLE FOR ANY DAMAGE TO YOUR COMPUTER HARDWARE, SOFTWARE, SYSTEMS, AND NETWORKS, ANY LOSS OF DATA THAT RESULTS FROM THE DOWNLOAD OF ANY INFORMATION FROM THE WEBSITE, AND FOR ANY OTHER DAMAGE THAT MAY BE INCURRED.
WE MAKE NO REPRESENTATION THAT THE WEBSITE IS APPROPRIATE OR AVAILABLE FOR USE IN LOCATIONS OTHER THAN THE UNITED STATES. IF YOU CHOOSE TO ACCESS THE WEBSITE FROM LOCATIONS OTHER THAN THE UNITED STATES, YOU DO SO AT YOUR OWN RISK AND YOU ARE RESPONSIBLE FOR COMPLYING WITH APPLICABLE LAWS AND REGULATIONS.
NO ADVICE OR INFORMATION, ORAL OR WRITTEN, OBTAINED BY YOU FROM SPROUTS OR IN ANY MANNER FROM THE WEBSITE CREATES ANY WARRANTY.

## 13. LIMITATION OF LIABILITY.

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT WILL SPROUTS, ITS AFFILIATES, OR ITS OR THEIR RESPECTIVE OFFICERS, DIRECTORS, AGENTS, JOINT VENTURERS, LICENSORS, SUPPLIERS, CONTRACTORS, REPRESENTATIVES, OR EMPLOYEES ("SPROUTS PARTIES") BE LIABLE TO YOU OR ANY PARTY FOR ANY DIRECT, INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES OR LOSSES, OR ANY OTHER DAMAGE OR LOSS OF ANY KIND, ARISING OUT OF OR IN CONNECTION WITH THE WEBSITE OR YOUR ACCESS TO OR USE OF, OR INABILITY TO ACCESS OR USE, THE WEBSITE (INCLUDING WITHOUT LIMITATION THE INPUT OF PERSONALLY IDENTIFIABLE AND OTHER INFORMATION INTO THE WEBSITE), HOWEVER AND WHEREVER ARISING, WHETHER THE CLAIM IS BASED IN CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, WARRANTY, OR OTHERWISE, AND EVEN IF A SPROUTS PARTY HAS EXPRESS KNOWLEDGE OF THE POSSIBILITY OF THE DAMAGE OR LOSS.
YOUR SOLE AND EXCLUSIVE REMEDY IS TO STOP ACCESSING AND USING THE WEBSITE. WITHOUT LIMITING THE FOREGOING, IN NO EVENT WILL THE TOTAL LIABILITY OF THE SPROUTS PARTIES UNDER THESE TERMS OR REGARDING THE WEBSITE EXCEED ONE HUNDRED DOLLARS ($100), EVEN IF THIS REMEDY FAILS OF ITS ESSENTIAL PURPOSE. SOME JURISDICTIONS DO NOT ALLOW LIMITATIONS OF CERTAIN DAMAGES SO SOME OF THE FOREGOING MAY NOT APPLY TO YOU. YOU AND SPROUTS AGREE THAT ANY CAUSE OF ACTION BY YOU ARISING OUT OF OR RELATED TO THESE TERMS MUST COMMENCE WITHIN ONE (1) YEAR AFTER THE CAUSE OF ACTION ACCRUES. OTHERWISE, SUCH CAUSE OF ACTION IS PERMANENTLY BARRED.

## 14. Indemnification.

You will indemnify, defend, and hold harmless the Sprouts Parties from and against any claims, demands, losses, liabilities, complaints, actions, damages,

judgments, settlements, fines, penalties, expenses, and costs, including reasonable attorneys' fees, due to or arising out of your access to or use of the Website, your misuse of any material, data, or other information downloaded or otherwise obtained from the Website, your order of products or services via the

Website, your breach of these Terms, or your violation of any law, regulation, or rights of any third party. We reserve, and you grant to us, the exclusive right to assume the defense and control of any matter subject to indemnification by you.

## 15. Third-Party Websites.

You understand and agree that when using the Website you may be exposed to information from a variety of sources and that Sprouts is not responsible for the accuracy, content, usefulness, safety, or intellectual property rights of or relating to such information. Additionally, the Website may link to, or be linked to, websites not maintained or controlled by Sprouts. Those links are provided as a convenience and Sprouts is not responsible for examining or evaluating the content or accuracy of, and does not warrant or endorse, any third-party website or any products or services made available through those websites. Please take care when leaving the Website to visit a third-party website. You should read the terms of use and privacy policy for each website that you visit.

## 16. Linking to the Website.

If you operate a website and are interested in linking to the Website: (a) the link must be a text-only link and clearly marked; (b) the link must "point" to the URL "https://www.sprouts.com/" and not to any other page; (c) the link and its use must be in connection with a website of appropriate subject matter; (d) the link and its use must not, nor have the potential to, damage or dilute the goodwill associated with Sprouts Marks; (e) the link and its use must not create the false appearance that any program, person, or entity is associated with or sponsored by Sprouts; and (f) the link, when activated by a user, must display the Website full-screen and not within a frame. Sprouts reserves the right to revoke consent to link to the Website at any time in its sole discretion, either by amending these Terms or through other notice.

## 17. Feedback.

Sprouts welcomes comments and other feedback regarding the Website. If you submit feedback to us regarding the Website, via email or otherwise, it will not be considered or treated as confidential. You warrant that you have all rights necessary to submit any feedback. We may use any comments and feedback that you send us in our discretion and without attribution or compensation to you.

## 18. Governing Law.

These Terms will be governed by the laws of the State of Arizona, without regard to any laws that would direct the choice of another state's laws and, where applicable, by the federal laws of the United States. You irrevocably and unconditionally consent to submit to the exclusive jurisdiction of the federal or state courts, as applicable, located in Maricopa County, Arizona, for any dispute or litigation arising out of or relating to these Terms or the use of the Website unless otherwise determined by Sprouts in its sole discretion. You waive any objection to the laying of venue of any such litigation in Arizona courts and agree not to claim that any litigation has been brought in an inconvenient forum. In other words, if you and Sprouts have a dispute, you agree to resolve it in a Maricopa County, Arizona, court unless otherwise determined by Sprouts in its sole discretion. You agree that the Website will be deemed solely located in Arizona and the Website is and will be deemed a passive website that does not give rise to personal jurisdiction over Sprouts, either specific or general, in jurisdictions other than Arizona.

## 19. Arbitration Agreement; Class Waiver; Waiver of Trial by Jury.

Please read the following paragraphs carefully because they require you to arbitrate disputes with Sprouts and limit the manner in which you can seek relief from us.

**A. Applicability.** You agree that any dispute, controversy or claim arising out of, or relating to, these Terms (including the breach, termination, enforcement, interpretation, or validity of these Terms) (together, "**Disputes**") will be resolved by confidential and binding arbitration on an individual basis as described in these Terms (this "**Arbitration Agreement**"). The place of arbitration will be Maricopa County, Arizona, unless otherwise agreed to in writing by all parties to the arbitration. But, in the event of any actual, alleged, or threatened violation of confidentiality or violation of Sprouts' intellectual property or other proprietary rights, Sprouts may immediately resort to court proceedings in a court of competent jurisdiction in order to seek immediate injunctive relief without posting bond, proving damages, or meeting any similar requirement. Any institution of any action for injunctive relief will not constitute a waiver of the right or obligation of either party to submit any claim seeking relief other than injunctive relief to arbitration. This Arbitration Agreement applies to you; Sprouts; Sprouts' affiliates; Sprouts' and its affiliates' respective directors, officers, employees, owners, agents, predecessors in interest, successors in interest, and assigns; authorized and unauthorized users or beneficiaries of the Website; and any third-party beneficiaries. This Arbitration Agreement evidences a transaction involving interstate commerce and the Federal Arbitration Act, 9 U.S.C. Sections 1-16, will govern the interpretation, enforcement, and proceedings pursuant to this Arbitration Agreement.

**B. Arbitrator.** Arbitration proceedings will be administered by the American Arbitration Association (" AAA") and in accordance with the AAA's Commercial Arbitration Rules and the Supplementary Procedures for Consumer-Related Disputes then in effect except as stated below. A single arbitrator with knowledge of electronic commerce will conduct the arbitration and that arbitrator may grant injunctions or other relief in such dispute or controversy. The parties will mutually agree upon such arbitrator, but if the parties have not agreed on an arbitrator within thirty (30) days of the date of the notice of intention to arbitrate, the AAA will select the arbitrator from its list of commercial arbitrators. The arbitrator will conduct a single hearing no longer than one (1) day in duration for the purpose of receiving evidence and will render a decision within fifteen (15) days after the conclusion of the hearing. The decision of the arbitrator will be final, conclusive and binding on the parties to the arbitration. Judgment may be entered on the arbitrator's decision in any State or Federal court of competent jurisdiction. The cost of the arbitrator will be shared equally, and all other expenses of arbitration, including attorneys' fees, will be paid by the party who incurred them. Any arbitration proceeding may not be consolidated or joined with any other proceeding and will not proceed as a class action. **You further agree that you will not participate in any way in any class action in connection with any Dispute, either as a class representative plaintiff or as a member of a putative**

class. The parties understand that they would have had a right or opportunity to litigate Disputes through a court, to have a judge or jury decide their case, and to participate in a class action or other proceeding involving multiple claimants, but they have instead chosen to have all Disputes decided through individual arbitration.

C. Place; Federal Arbitration Act. The place of arbitration will be Maricopa County, Arizona, unless otherwise agreed to in writing by all parties to the arbitration. This Arbitration Agreement evidences a transaction involving interstate commerce and the Federal Arbitration Act, 9 U.S.C. Sections 1-16, will govern the interpretation, enforcement, and proceedings pursuant to this Arbitration Agreement.

D. Confidentiality. Any and all actions taken under this Arbitration Agreement, including all filings, orders, judgments, and awards made in any arbitration proceeding, are confidential and may not be disclosed to any third party.

E. Time Limitation on Claims. Arbitration proceedings must be initiated within one (1) year after any Dispute arises; otherwise, the Dispute is permanently barred.

# 20. Assignment.

Neither these Terms, nor any rights hereunder, may be assigned by operation of law or otherwise, in whole or in part, by you without the prior written permission of Sprouts. Any purported assignment without such permission will be void. These Terms may be assigned by Sprouts in whole or in part without notice.

# 21. Third-Party Beneficiaries.

These Terms do not confer any rights, remedies, or benefits upon any person other than you and Sprouts, except that our affiliates are third-party beneficiaries of these Terms.

# 22. Entire Agreement; Interpretation.

These Terms, including our Privacy Policy and, as applicable, our Mobile Coupon Terms and any other items incorporated herein, are the entire agreement between the parties with respect to their subject matter and supersede any and all prior or contemporaneous or additional communications, negotiations, and agreements with respect thereto. Any Sprouts waiver of any rights under these Terms must be in writing, signed by Sprouts, and any such waiver will not operate as a waiver of any future breach of these Terms. In the event any portion of these Terms is found to be illegal or unenforceable, such portion will be severed from these Terms and the remaining provisions will be separately enforced. The headings in these Terms are for convenience only and do not affect the interpretation of these Terms. These Terms inure to the benefit of Sprouts' successors and assigns.

# 23. Electronic Communications.

These Terms and any other documentation, agreements, notices, or communications between you and Sprouts may be provided to you electronically to the extent permissible by law. Please print or otherwise save a copy of all documentation, agreements, notices, and other communications for your reference.

# 24. Contact Us.

If you have any questions or comments about Sprouts, the Website, or these Terms, you may contact Sprouts using our Website's Contact Us form or at:

Sprouts Farmers Market, Inc.
5455 E. High Street, Suite 111
Phoenix, Arizona 85054
Fax: 480-814-8017
Phone: 480-814-8016
Email: customerrelations@sprouts.com

© 2019 SFM LLC.    Corporate Site    Privacy Policy    Terms    Transparency    Home    Version: 1.3.3

# Exhibit I

Begin forwarded message:

**From:** "Lisa C. Oswalt" <Lisa.Oswalt@gonrsg.com>
**Subject: RE: Upcoming SI Coffee installs**
**Date:** May 5, 2016 at 2:31:49 PM PDT
**To:** Karen Peters <karen.peters@bestroast.coffee>
Cc: Mark Morton <markmorton@sprouts.com>, Alvin Duran <AlvinDuran@sprouts.com>, Bob Lambert <BobLambert@sprouts.com>, Jason Roe <jason.roe@bestroast.coffee>, Scott Coleman <scottcoleman@sprouts.com>, pm <pm@gonrsg.com>, Steven Hagen <stevenhagen@sprouts.com>

Great, thank you!

---

**From:** Karen Peters [mailto:karen.peters@bestroast.coffee]
**Sent:** Thursday, May 5, 2016 2:31 PM
**To:** Lisa C. Oswalt <Lisa.Oswalt@gonrsg.com>
**Cc:** Mark Morton <markmorton@sprouts.com>; Alvin Duran <AlvinDuran@sprouts.com>; Bob Lambert <BobLambert@sprouts.com>; Jason Roe <jason.roe@bestroast.coffee>; Scott Coleman <scottcoleman@sprouts.com>; pm <pm@gonrsg.com>; Steven Hagen <stevenhagen@sprouts.com>
**Subject:** Re: Upcoming SI Coffee installs

Thanks.  I'll update our spreadsheet accordingly.

I have inquired about store 322 to UNIC and let you know once I get clarification.

Regards,

Karen

On May 5, 2016, at 2:01 PM, Lisa C. Oswalt <Lisa.Oswalt@gonrsg.com> wrote:

> Karen, I sent this email back in March.
>
> I adjusted the two dates that we are doing on Monday below and highlighted them.  They were originally 5/6.
>
> I do not know if your team installed Unic equipment at 322 when you did 314?  Can you confirm that so we can update our records.  That is the only question I have since this 3/9/16 email.
>
> Let me know if you need anything else?
>
> ---
>
> **From:** Lisa C. Oswalt
> **Sent:** Wednesday, March 9, 2016 4:14 PM
> **To:** Jason Roe <jason.roe@bestroast.coffee>

**Cc:** Steven Hagen <stevenhagen@sprouts.com>; pm <pm@gonrsg.com>; Robert Banovich <robertbanovich@sprouts.com>; Dave Wilcox <DaveWilcox@sprouts.com>
**Subject:** Upcoming SI Coffee installs
**Importance:** High

Jason, see below for the upcoming sites we need your program installed in.

For the TBA – why don't you confirm with your team and Curtis when they will have the equipment avaibable to swap out with the Bunn?

| Store | Company | Address | City | State | ZIP | Unic Coffee install |
|-------|---------|---------|------|-------|-----|---------------------|
| **029** | | **23269 N Scottsdale** | **Scottsdale** | **ca** | **85255** | *tba* |
| 236 | HSN | 1011 N. San Fernando Blvd | Burbank | CA | 91507 | *tba* |
| 120 | HSN | 655 Sunland Park Dr | El Paso | TX | 79912 | *tba* |
| 014 | SFN | 2582 S. Val Vista Drive | Gilbert | AZ | 85296 | *tba* |
| 239 | HSN | 2618 El Camino Real | Carlsbad | CA | 92008 | *tba* |
| 505 | SFN | 10000 W Sahara Ave | Las Vegas (Summerlin) | NV | 89117 | *tba* |
| 010 | SFN | 5225 E. Southern Ave. | Mesa (Higley) | AZ | 85206 | *tba* |
| 322 | SUN | 3625 E Colfax Ave | Denver (Colfax) | CO | 80206 | *need the date* |
| 013 | SFN | 1813 N. Dysart Road | Avondale | AZ | 85392 | *Friday, March 11, 2016* |
| 254 | HSN | 9361 Mission Gorge Rd | Santee | CA | 92071 | *Friday, March 11, 2016* |

| | | | | | | |
|---|---|---|---|---|---|---|
| 314 | SUN | 4700 W. 38th Avenue | Denver | CO | 8021 2 | *Friday, March 11, 2016* |
| 026 | SUN | 1560 S. Riordan Ranch St | Flagstaff | AZ | 8600 1 | *Friday, March 25, 2016* |
| 203 | SFN | 149 S Las Posas Road | San Marcos | CA | 9207 8 | *Friday, March 25, 2016* |
| 259 | SFN | 1530 Geary Road | Walnut Creek | CA | 9459 7 | *Friday, March 25, 2016* |
| 276 | SFN | 301 Gellert Blvd | Daly City | CA | 9401 5 | *Friday, April 8, 2016* |
| 222 | SFN | 1515 Hawthorne Blv d | Redondo Beach | CA | 9027 8 | *Friday, April 22, 2016* |
| 230 | HSN | 8211 Laguna Blvd | Elk Grove | CA | 9575 8 | *Friday, April 22, 2016* |
| 016 | SFN | 4735 E Ray Rd #100 | Phoenix (Ahwatukee) | AZ | 8504 4 | *Monday, May 9, 2016* |
| 234 | HSN | 4439 Genesee Ave | San Diego (Genessee) | CA | 9211 7 | *Monday, May 9, 2016* |
| 305 | SFN | 1150 S. Ironton St #130 | Aurora | CO | 8001 2 | *Friday, May 6, 2016* |
| 018 | SUN | 245 E. Bell Road #15 | Phoenix (3rd St) | AZ | 8502 2 | *Friday, May 20, 2016* |

| 228 | HSN | 3315 Rosecrans St #B | San Diego (Point Loma) | CA | 9211 0 | *Friday, May 20, 2016* |
| 019 | SUN | 4402 N. Miller Road | Scottsdale | AZ | 8525 1 | *Friday, June 3, 2016* |
| 803 | SUN | 559 West Main St | Norman | OK | 7306 9 | *Friday, June 3, 2016* |
| 024 | SUN | 4645 E. Speedway Blvd | Tucson | AZ | 8571 2 | *Friday, June 17, 2016* |
| 102 | STN | 2301 Cross Timbers  #200 | Flower Mound | TX | 7502 8 | *Friday, June 17, 2016* |
| 260 | SFN | 4253 Woodruff Ave | Lakewood | CA | 9071 3 | *Friday, June 17, 2016* |
| 140 | SFN | W 5711 I-20 | Arlington | TX | 7601 7 | *Friday, July 1, 2016* |
| 136 | SFN | 195 Yale St #100 | Houston | TX | 7700 7 | *Friday, July 15, 2016* |
| 208 | SFN | 12301 Seal Beach Blvd | Seal Beach | CA | 9074 0 | *Friday, July 29, 2016* |