IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| SFM LLC, | No. CV-19-04820-PHX-JAT |
| Plaintiff, | **ORDER** |
| v. | |
| Best Roast Coffee LLC, et al., | |
| Defendants. | |

Pending before the Court is Defendants Best Roast Coffee ("Best Roast") and Jason Roe's Motion to Stay the Proceedings and Compel Arbitration and, Alternatively, Motion for Dismissal, (Doc. 20). Plaintiff SFM LLC ("Sprouts") has responded, (Doc. 21), and Defendants have replied, (Doc. 25). The Court now rules on the motion.

**I.     Background**

Sprouts operates a chain of grocery stores that emphasizes healthy and affordable food. (Doc. 1 at 3-4 ¶¶ 16, 18). Among other items, Sprouts sells pre-packaged products under its "Sprouts Market Corner" and "Market Corner Trademarks." (*Id.* at 5 ¶ 28). Sprouts also offers its customers coffee under the trademarks "Sprouts" and "Sprouts Farmers Market." (*Id.* at ¶ 30). Consumers may find Sprouts' branded products only in Sprouts' grocery stores, or on its web site and "Instacart platform." (*Id.* at 6 ¶ 31).

In December of 2015, Sprouts entered into a business relationship with Best Roast, a private label coffee bean and equipment distributor, whereby Sprouts would order coffee and coffee-related equipment from Best Roast. (*Id.* at 8 ¶¶ 43-50). When Best

Roast failed to deliver on several of Sprouts' equipment orders, or to reimburse Sprouts, Sprouts sued Best Roast and its CEO—Jason Roe—for damages in October 2017. (*Id.* at 8-9 ¶¶ 51-57). Roe later emailed Sprouts employees to inform them that Best Roast was "beginning to target Coffee [sic] customers into Sprouts now, via www.Sprouts.Coffee" and asking them to "join [Best Roast] in attracting more attention of coffee customers, who currently [do] not shop at [S]prouts." (Doc. 1-5, Ex. D, at 2). Pictures of www.sprouts.coffee from May of 2018 reveal that Best Roast claimed its coffee was sold in Sprouts' stores under the Market Corner brand and that Sprouts "uses equipment, SOP processes, 'Know How,' and Trade Secrets of Best Roast" pursuant to an agreement between the parties. (Doc. 1-8, Ex. G, at 2-4, 6-9). Likewise, on www.bestroast.coffee, Best Roast listed nearly four-pages-worth of Sprouts locations that it claimed served Best Roast's coffee, explaining its "focus now is guiding, daily coffee drinkers, into resently [sic] established Sprouts farmers Market Market Corner, Tea—Coffee—Espresso Bar." (Doc. 1-7, Ex. F., at 9-13).

Although Best Roast initially complied with Sprouts' demand to cease attempting to associate itself with Sprouts online, Best Roast resumed this behavior in July of 2019, even sending Sprouts an email insisting that their relationship continue. (Doc. 1 at 10-11 ¶¶ 68-70). The email attached two links to a press release about Best Roast in which Roe boasted of an ongoing business relationship between Sprouts and Best Roast. (Docs. 1-10, Ex. I; 1-11, Ex. J). Later that month, Roe sent an email to Sprouts claiming "Sprouts and Magnetized water[] was the resent [sic] topic of discussion in Harvard this year too. I did the breakthrough innovation as my final assignment in the 'Disruptive Strategy' module at Harvard Business School." (Doc. 1-13 at 2). He also complained that Sprouts had "shut down any social media of Sir Richard Branson and I promoting espresso bars and Sprouts," a decision he felt "did not seem to serve [S]prouts espresso coffee revenue interest and came at the expense to Sprouts of lost high profile promotion." (*Id.*) Roe was adamant that, with his help, Sprouts could increase its "stock price back to its deserving strength above $25, allot [sic] faster than day to day and conventional methods would."

(*Id.*).

On July 25, 2019, Sprouts filed a complaint in this Court seeking injunctive relief and damages based on claims that Best Roast engaged in: trademark infringement, cybersquatting, false endorsement, and false advertising. (Doc. 1 at 16-20).

**II.  Discussion**

    **A. Legal Standard**

The Federal Arbitration Act ("FAA") applies to arbitration agreements in contracts affecting interstate commerce, and provides that such agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity" to revoke them. 9 U.S.C. §§ 1, 2. Thus, when a valid arbitration clause applies to a dispute, the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985). Of course, because "arbitration is a matter of contract . . . a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers v. Warrior Gulf & Nav. Co.*, 363 U.S. 574, 582 (1960). A court's first task, then, is to determine whether the parties have agreed to arbitrate the dispute in question, applying "general state-law principles of contract interpretation, while giving due regard to the federal policy in favor of arbitration by resolving ambiguities as to the scope of arbitration in favor of arbitration." *Wagner v. Stratton Oakmont, Inc.*, 83 F.3d 1046, 1049 (9th Cir. 1996). "[A]s with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985). But "[t]he presumption in favor of arbitration . . . does not apply 'if contractual language is plain that arbitration of a particular controversy is not within the scope of the arbitration provision.'" *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1044–45 (9th Cir. 2009) (citation omitted).

    **B. Arbitration**

Best Roast argues that because all of Sprouts' claims "arise directly from the parties' business relationship established by" their "Non-Circumvention Agreement" (the "NCA") the Court must compel the parties to arbitrate these claims. (Doc. 20 at 5-8). In response, Sprouts contends (1) it never agreed to arbitrate the disputes involved in the instant case and (2) the NCA does not apply at all because the parties' indemnification agreement superseded it. (Doc. 21 at 2). Even assuming the NCA has not been superseded, the Court agrees with Sprouts.

The arbitration clause in the NCA provides that "any dispute, controversy, or claim *related to or arising from the terms of this Agreement* . . . shall be settled by arbitration. (Doc. 20, Ex. D, at 20). For a claim to be properly characterized as relating to or arising from a given contract under Arizona law, "it must, at the very least, raise some issue the resolution of which requires a reference to or construction of some portion of the contract itself." *See Dusold v. Porta-John Corp.*, 807 P.2d 526, 530 (Ariz. Ct. App. 1990); *see also Sun Valley Ranch 308 Ltd. P'ship ex rel. Englewood Props., Inc. v. Robson*, 294 P.3d 125, 131–32 ¶ 22 (Ariz. Ct. App. 2012) (explaining that unjust enrichment claims would be subject to arbitration clause because whether defendants were enriched without justification required examining the contract's terms). Arizona courts reason that, when a claim lacks such a connection, parties employing this language could not reasonably have intended the arbitration clause to cover it. *Dusold*, 807 P.2d at 530. Thus, the relevant inquiry is whether resolving Sprouts' claims (trademark infringement, cybersquatting, false endorsement, and false advertising) necessarily requires consideration of the NCA's terms.

Aside from recitals and various miscellaneous provisions—including the dispute resolution clause—the NCA's critical terms are contained in Article I, which is titled "Non-Circumvention." (Doc. 20, Ex. D, at 19). Section I of that Article states that, absent Best Roast's permission, Sprouts shall not "contact or initiate contact at any time for any purpose, either directly or indirectly, the Opportunity or any officers, directors, shareholders, consultants, attorneys, employees, agents or other affiliates of the

Opportunity, or any other property or property whose identity was revealed through the efforts of [Best Roast]." (*Id.*). Section I provides further that, absent Best Roast's permission, Sprouts "agrees not to undertake any transaction or a series of transactions of any kind with the Opportunity or to collect any fees in connection with the Opportunity." (*Id.*). Although the NCA does not define "Opportunity," neither party disputes that it refers to Sprout's opportunity to purchase goods and services from Best Roast, namely the opportunity to use its claimed proprietary coffee-making method in Sprouts' stores. (*Id.* at 24; Docs. 20 at 3; 21 at 7). Section II contains the NCA's other relevant terms and forbids the parties from disclosing any trade secrets that the parties have communicated to each other to third parties without express written permission. (Doc. 20, Ex. D, at 20).

After reviewing these provisions, it is clear and obvious that none of Sprouts' claims have anything to do with them. Section I, after all, imposes obligations *only on Sprouts*, preventing it from communicating with any of Best Roast's contacts associated with its coffee business without permission. Moreover, this case does not concern any "transactions of any kind with the Opportunity." Indeed, Sprouts seeks precisely the opposite—one of its goals in this litigation is to end Best Roast's attempts to associate itself with Sprouts through its online activity following Sprouts' termination of its business relationship with Best Roast. (See Doc. 1 at 9 ¶ 57). Nor do Sprouts' claims implicate trade secrets belonging to either party. In short, whether Best Roast engaged in trademark infringement, cybersquatting, false endorsement, or false advertisement—after Sprouts had already sued it for damages—does not depend on any rights or obligations established by the NCA. Accordingly, because resolving Sprouts' claims does not require "reference to or construction of some portion of the" NCA, its dispute resolution clause does not apply to them. *See Dusold*, 807 P.2d at 530.[1]

### III. Conclusion

Based on the foregoing,

---

[1] Best Roast's alternative request that this Court dismiss Sprouts' claims for failure to state a claim upon which relief can be granted is similarly premised on its contention that the arbitration clause applies, (Doc. 20 at 8), thus the Court need not separately address it.

**IT IS ORDERED** that Defendants' Motion to Stay the Proceedings and Compel Arbitration and, Alternatively, Motion for Dismissal (Doc. 20) is **DENIED**.

Dated this 24th day of September, 2019.

James A. Teilborg
Senior United States District Judge